IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

SHERRY MOORE                                                        PLAINTIFF

v.                                          CIVIL ACTION NO. 3:21-CV-253-SA-JMV

UNUM LIFE INSURANCE COMPANY OF
AMERICA                                                            DEFENDANT

ORDER AND MEMORANDUM OPINION

On December 13, 2021, Sherry Moore filed her Complaint [1] under the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, against Unum
Insurance Company of America ("Unum"), alleging that Unum wrongfully denied her claim for
long term disability ("LTD") benefits. Now before the Court is Moore's Motion for Summary
Judgment [15] and Unum's Motion for Judgment on the Administrative Record or, alternatively,
Motion for Summary Judgment [17].[1] Having reviewed the parties' filings, as well as the
applicable authorities, the Court is prepared to rule.

*Relevant Factual & Procedural Background*[2]

On February 28, 2011, Sherry Moore began working as a Tosser/Inspector at Ajinomoto
Windsor, Inc., a company to which Unum had issued an LTD policy. In this position, Moore tossed
and inspected burritos on a production line at a food manufacturing plant. This job required
frequent standing and walking.

---

[1] Unum filed a Response [19] to Moore's Motion for Summary Judgment [15], to which Moore filed a
Reply [21]. Moore did not file a response to Unum's Motion for Judgment on the Administrative Record [17].
[2] This is a brief recitation of facts. The Court will set forth more detailed findings of fact below.

In July 2016, Moore stopped working due to cellulitis, Charcot's joint in her right foot,[3] and uncontrolled diabetes mellitus. Moore was briefly hospitalized and did not return to work for several months. After returning to work for a short period, Moore was hospitalized again and this time remained out of work. Thereafter, Moore applied for LTD benefits.

To qualify as disabled under the Unum policy, Moore must have been "limited from performing the **material and substantial duties** of [her] **regular occupation**" (i.e. her own occupation). [14], Ex. 1 at p. 185 (emphasis in original). Under the terms of the policy, after an individual received benefits for 24 months, the definition of disabled changed to "unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training, or experience," due to the same sickness or injury. *Id*. (emphasis in original). Unum initially approved Moore's LTD claim, finding that her health conditions involving her feet would impair her ability to return to her work on the food production line.

As Unum continued to review Moore's eligibility for benefits, and after 24 months had passed, Unum concluded that Moore was no longer disabled under the terms of the policy because, Unum found, Moore was able to perform the duties of a sedentary occupation that would qualify as a "gainful occupation" under the policy. Unum therefore discontinued Moore's LTD benefits. Consistent with the policy, Moore internally appealed Unum's decision, and Unum upheld the denial of benefits, again finding that Moore was capable of sedentary work.

Moore subsequently filed suit under ERISA, alleging that her LTD benefits claim was wrongfully denied. Moore moves for summary judgment, seeking a declaration from this Court

---

[3] Charcot's joint, in short, is an inflammatory condition that causes gradual degeneration of the joint. It has been found to occur as a consequence of peripheral neuropathy (loss of sensation). Lee C. Rogers, D.P.M., et al., *The Charcot Foot in Diabetes*, 34 DIABETES CARE (ISSUE 9) 2123 (2011).

that she is entitled to LTD benefits under the policy. She additionally seeks attorney's fees. On the other hand, Unum moves for a judgment upholding the benefits determination decision.

*Legal Standard*

As an initial matter, the parties dispute which standard of review the Court should apply.[4] When an ERISA plan grants an administrator discretionary authority to interpret the plan's terms and determine benefit eligibility, the court reviewing the denial of a claim must assess whether the administrator abused that discretion. *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989)). When no such discretionary authority is granted, the court reviews the claim denial *de novo*. *Id*. at 254.

"Discretionary authority cannot be implied; an administrator has no discretion to determine eligibility or interpret the plan unless the plan language expressly confers such authority on the administrator." *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 636 (5th Cir. 1992) (internal citation omitted). The Fifth Circuit has imposed no "linguistic template" but instead reads the plan as a whole to determine whether discretionary authority exists. *Id.* at 636-37; *see also Jimenez v. Sun Life Assur. Co. of Canada*, 486 F. App'x 398, 405 (5th Cir. 2012). Here, there is no clause explicitly granting the administrator discretion to interpret the policy or determine eligibility for

---

[4] In her Memorandum [16], Moore asserts that "[t]he administrator's decision must be supported by 'substantial' evidence," that "a conflict of interest exists when the administrator is the insurer," and that "[c]ourts often find Unum abused its discretion in denying claims." [16] at p.3. Moore then argues Unum "arbitrarily dismiss[ed] its own occupational testimony." [16] at p. 4. In other words, though Moore does not specifically state which standard she believes applies, her assertions clearly indicate an argument premised upon an abuse of discretion standard. *See, e.g., Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 307 (5th Cir. 2015) (applying the abuse of discretion standard, explaining that "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail") (additional citation omitted). On the other hand, Unum alleges that the plan confers no discretionary authority to the administrator and therefore the applicable standard of review is *de novo*. [18] at p. 2.

benefits, nor does such discretion exist looking at the plan as a whole. The Court will review the denial of benefits *de novo*.

"The court must, in a *de novo* review, 'independently weigh the facts and opinions in the administrative record to determine whether the claimant has met [her] burden of showing [she] is disabled within the meaning of the policy.'" *Pike v. Hartford Life and Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1030 (N.D. Tex. 2019) (quoting *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010)). The plaintiff bears the burden of proving she is disabled by a preponderance of the evidence. *Id*. at 1031 (citing *Gileswski v. Provident Life & Accident Ins. Co.*, 683 F. App'x 399, 406 (6th Cir. 2017)). "The burden of proof does not change because a plaintiff qualified at one point in time for disability benefits and the benefits were later terminated when she no longer qualified." *Id*. at 1072. (additional citations omitted).

The Court also notes one additional issue associated with the applicable review standard. The parties have filed two different types of motions—Moore moves for summary judgment, and Unum moves for judgment on the administrative record, or, alternatively, summary judgment. In the Fifth Circuit, there is an open question as to whether it is appropriate to resolve ERISA claims subject to *de novo* review on summary judgment, or whether the district court should conduct a bench trial. *Katherine P. v. Humana Health Plan, Inc.*, 959 F.3d 206, 208 (5th Cir. 2020) (citing *Ariana M.*, 884 F.3d at 246).[5]

---

[5] In *Katherine P.*, the Fifth Circuit declined to reach the issue since it was not raised by the parties and instead applied "normal summary judgment standards." *Katherine P. v. Humana Health Plan, Inc.*, 959 F.3d 206, 208 (5th Cir. 2020) (citing *Ariana M.*, 884 F.3d at 246). However, the court announced that summary judgment was not appropriate in an ERISA case subject to *de novo* review (unlike in cases reviewed for abuse of discretion) if the administrative record presents a genuine issue of material fact. *Id.*; *see also Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 7467 (N.D. Tex. 2019) (explaining that judgment on the record is appropriate where there is a genuine issue of fact because proceeding to "trial from scratch" would be inconsistent with ERISA's purposes).

Even in cases where the parties consent to summary judgment, some courts have found it most appropriate to resolve cases subject to *de novo* review with a trial on the administrative record and briefing. *See, e.g. Zurawin v. Unum Life Ins. Co. of Am.*, 2020 WL 5506588, at *1 (S.D. Tex. Aug. 27, 2020). While a motion for judgment on the administrative record (the motion Unum has filed) is not found in the Federal Rules of Civil Procedure, the court may treat such a motion as a request for a bench trial on the papers with the District Court acting as the finder of fact. *Hall v. Mutual Omaha Ins. Co.*, 2018 WL 1440075, at *2 (N.D. Miss. Mar. 22, 2018) (quoting *O'Hara v. Nat'l Union Fire Ins. Co. of Pitt.*, 642 F.3d 110, 116 (2d Cir. 2011)). "In that scenario, the district court may make factual findings, but it must be clear that the parties consent to a bench trial on the parties' submissions." *Id*.

Here, Moore did not expressly stipulate to a bench trial on the papers, but the parties agreed that the case would be "decided on the briefs." *See* [8]. The Court therefore did not schedule a trial date. Further, when Unum moved for judgment on the administrative record, Moore did not file a response objecting to resolving the matter in that manner. Therefore, the Court finds that a trial on the administrative record is appropriate in this case.[6]

Rule 52 governs actions "tried on the facts without a jury" and requires the Court to "find the facts specially and state its conclusions of law separately." FED. R. CIV. P. 52(a). In the Fifth Circuit, the Court need not "set out [its] findings on all factual questions that arise in a case" or "trac[e] the claims issue by issue or witness by witness." *Pike*, 368 F. Supp. 3d at 1071 (additional citations omitted). "[A] court's findings are sufficient to satisfy Rule 52 if they afford the reviewing

---

[6] The Court also finds a trial on the administrative record most appropriate because both parties simply argue that the denial of benefits was or was not correct. "In the ERISA context, motions under Rule 52 or under Rule 56 'are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record.'" *Graham v. Life Ins. Co. of N. Am.*, 222 F. Supp. 3d 1129, 1137 (N.D. Ga. 2016) (quoting *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 n.2 (1st Cir. 2016)).

court a clear understanding of the factual basis for the trial court's decision." *Id*. (internal alterations omitted).

The Court's review is limited to the administrative record. *Ariana M.*, 884 F. 3d at 256-57 (citing *Vega v. National Life Ins. Servs. Inc.*, 188 F. 3d 287 (5th Cir. 1999) (en banc) *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)).

*Findings of Fact*

Consistent with the above-referenced authorities, the Court will first set forth its specific findings of fact before analyzing the benefits determination.

I.      *Unum LTD Policy*

The Unum policy defines "disabled" as follows:

> - you are limited from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

[14], Ex. 1 at p. 185 (emphasis in original).

After an employee receives benefits for 24 months, the policy's definition of disabled changes to "unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience," due to the same sickness or injury. *Id*. (emphasis in original). In simple terms, the policy mandates coverage for an initial period of 24 months so long as the claimant is unable to perform the duties of her "regular occupation," but, after the initial 24-month period, the claimant must be unable to perform the duties of "any gainful occupation" to qualify for continued benefits. The policy further states that the claimant "must be under the regular care of a physician in order to be considered disabled." *Id*.

## II.    Initial LTD Determination

In July 2016, Moore stopped working due to Charcot's joint in her right foot and ankle, cellulitis in her right leg, and uncontrolled diabetes mellitus.[7] Moore was hospitalized from July 12 through July 13, 2016 for those conditions.

On July 25, 2016, Moore saw Dr. Carey Craig Williams, a podiatrist at North Mississippi Foot Specialists. Dr. Williams performed x-rays which revealed a mid-foot collapse, indicating Charcot's joint in Moore's right foot and ankle. He advised Moore to stay in a controlled ankle movement walker ("CAM walker") and to not work until her follow-up appointment in six weeks.

For the remainder of 2016, Moore continued to see Dr. Williams and other podiatrists at North Mississippi Foot Specialists. On September 9, 2016, Dr. Shaun Lund advised Moore to stop any pressure or weightbearing on her right foot. Dr. Lund's notes state "[patient]'s charcot has gotten to the point that we fear this lower extremity might be lost." [14], Ex. 1 at p. 313. Dr. Lund advised Moore to stay in a soft cast until she could receive a Charcot Restraint Orthotic Walker ("CROW boot"). From September 2016 through December 2016, Moore had several additional appointments at North Mississippi Foot Specialists where she complained of pain and edema (swelling due to excess fluid) in her feet. On September 30, 2016, Moore received a CROW boot and was still advised to not put weight or pressure on her right foot. On November 18, 2016, in response to Unum's request for information, a doctor from North Mississippi Foot Specialists (whose name is illegible on the form) advised that Moore was to limit weightbearing to activities of daily living. In response to the question of when Moore could return to work, the doctor only advised that Moore was "unable to stand for long periods of time" and "would benefit from a sedentary position." [14], Ex. 1 at p. 285.

---

[7] Specifically, Moore has Type 1 (insulin-dependent) diabetes.

At the end of 2016, Moore returned to work for approximately 37 days—December 19, 2016 until January 23, 2017. On January 24, 2017, Moore was admitted to Merritt Health Batesville due to a diabetic ulcer with abscess on her left great toe. Moore's toe was subsequently amputated by Dr. Donald Parnell on January 27, 2017, and she was discharged from the hospital on February 3, 2017. Thereafter, Moore applied for LTD benefits.[8]

After the amputation of her toe, Moore followed up with Dr. Parnell on three occasions—February 8, 2017; February 21, 2017; and March 21, 2017. Her medical records indicate that the wound on her left great toe, as well as an ulcer on her left fifth toe, were healing well. However, the edema in her feet had become slightly worse at her March 21, 2017 appointment.[9] On April 4, 2017, Dr. Parnell returned to Unum a requested Medical Provider Form which stated: "[Moore] continues to have an open wound to [left] great toe which impairs her balance/walking." [14], Ex. 1 at p. 134. The form further stated that Moore was unable to work in any capacity from February 3, 2017 forward for an undetermined amount of time. On April 13, 2017, Dr. Parnell provided the same response to an additional request for information from Unum.

On May 3, 2017, Moore saw Joseph Tubbs, Family Nurse Practitioner, who was her primary care provider, and reported complaints of weight loss (15 pounds), shortness of breath when laying down, and edema in her lower legs, particularly her left leg. NP Tubbs subsequently referred Moore to a cardiologist and nephrologist (kidney specialist), though it is unclear which specific appointment resulted in those referrals.

---

[8] Moore also applied and was approved for short term disability benefits at some point after July 2016, though the date on which she applied for either benefit is unclear.
[9] Moore saw Joseph Tubbs, FNP on the same date and also complained of her edema that had become worse in the previous month.

On May 5, 2017, NP Tubbs responded to Unum's request for information. Under both "Restrictions (What patient should not do)" and "Limitations (What patient cannot do)," NP Tubbs wrote "Feb 2017-present; prolonged standing, walking, lifting." [14], Ex. 1 at p. 141.

On June 14, 2017, Moore saw Dr. J. Bunker Stout, a cardiologist, for her edema and shortness of breath. Dr. Stout's records state that Moore had been recently diagnosed with cardiomyopathy (a condition where the heart has difficulty pumping blood) and that he would schedule a Lexiscan nuclear study (a test to evaluate blood flow to the heart). Moore underwent the Lexiscan study on July 6, 2017, and the report states that Moore's "left ventricular systolic function appeared to be moderately reduced." [14], Ex. 1 at p. 886.

On June 21, 2017, Moore returned to North Mississippi Foot Specialists where Dr. Jared Spicer, a podiatrist, advised her to continue wearing her CROW boot and follow-up in three months.

On June 26, 2017, NP Tubbs faxed Unum another update on Moore's condition. The form stated that NP Tubbs advised Moore to return to work and that her expected return date was August 4, 2017. However, the form also indicated that Moore was scheduled to see NP Tubbs again on August 3, 2017 (the day before her expected return to work date). At the August 3, 2017 appointment, Moore complained of sweats during eating, shortness of breath when walking, edema (but improved), numbness to hands, dizziness, and frequent or severe headaches. Therefore, on August 8, 2017, NP Tubbs's response to Unum indicated that he recommended Moore return to work "without restrictions" on October 1, 2017. [14], Ex. 1 at p. 341. The form further stated that Moore should avoid "prolonged standing, bending, walking or operating machinery" because it "could exacerbate [her] symptoms." [14], Ex. 1 at p. 340.

The record reflects that on August 12, 2017, Unum was still gathering information to determine whether Moore was disabled within the terms of the policy and, if she was, what date her disability began. Unum particularly sought information regarding Moore's occupational demands but had had difficulty reaching Moore by phone or mail.

On August 22, 2017, Unum reached Moore by phone and discussed her medical treatment and occupational demands. *See* [14], Ex. 1 at p. 449-53. According to Unum's notes, Moore advised that treatment with the cardiologist was precautionary, and her diabetes was generally under control. She was still getting adjusted to her medications, which had recently caused her to pass out and become dehydrated. With respect to her plans to return to work, Moore explained that she wanted to get back to work but it depended on what would happen with her feet, which were healing slowly due to diabetes. Moore further explained that she worked in the back of the plant, which required a lot of walking during the day. Her job further required significant standing on the production line (while tossing and inspecting about 60 burritos per hour) and pulling pallets to the floor. While that did not require her to physically lift things, pulling the pallet was difficult because the boot was heavy and extended above her knee. Moreover, standing on the production line while wearing the boot on her right foot had caused Moore to compensate by placing more weight on the left foot (presumably resulting in the January 2017 hospitalization). When asked about other skills she may have, Moore advised that she could use a computer but did not use one daily. She further advised that she had no additional skills and had always worked in manufacturing.

On October 6, 2017, Moore saw Dr. Morris Hamilton, a nephrologist. Moore's medical records indicate diagnoses of cardiorenal syndrome (dysfunction of the kidneys due to heart problems), likely due to dilated cardiomyopathy, diabetes with chronic kidney disease,

10

microalbumin (proteins in urine), hypertension and hypertensive related chronic kidney disease, anemia of chronic kidney disease, and stage III chronic kidney disease. Dr. Hamilton adjusted Moore's medication, and Moore did not return for further treatment.

On October 18, 2017, Unum held a forum discussion to review Moore's claim. Present for the discussion were Leslie Jeffers, the Disability Benefit Specialist assigned to Moore's claim; Joe Vanier, Jeffers' director; Lisa Whitney, clinical representative; and Matthew Cunio, vocational representative. Moore's occupation was determined to be "light," "requiring occasional exertion of up to 20 pounds, frequent standing, occasional walking." [14], Ex. 1 at p. 770. Notes from the forum further state that it was reasonable Moore would have difficulty with the standing and walking demands of her occupation, indicating that Unum intended to approve the LTD claim. The notes seem to designate "cellulitis of toe" as Moore's "Primary" disabling issue, with "none" listed under "Secondary," though it seems Unum continued to investigate Moore's myriad of conditions. *Id*. Upon approval, Unum was to have a detailed phone call with Moore to receive an update on her right Charcot's foot and left toe amputation, as well as her cardiac, blood sugar, and kidney issues. Unum further intended to obtain a completed work experience and education questionnaire and updated medical records.

On October 20, 2017, Unum sent Moore a letter informing her that her LTD claim had been approved. The letter explained that her date of disability was July 25, 2016, and her benefit begin date was February 28, 2017. The letter further explained as follows:

> We approved your benefits because you are unable to perform the material and substantial duties of your regular occupation, at this time, due to your medical condition of cellulitis of left toe. Your benefits will continue as long as you meet the definition of disability in the policy provided by your employer and are otherwise eligible under the policy terms.
>
> . . .

> Barring any complications, and based on a review of your medical records to date, the typical recovery time for your medical condition is currently unknown.
>
> We will need additional information to better understand how [sic] your recovery time frame. We will follow up with you in approximately 3 months to obtain a medical update including any ongoing treatment and to discuss how your recovery is progressing.

[14], Ex. 1 at p. 784-85.

### III.    Denial of LTD Benefits

After approving Moore's LTD claim, Unum continued to follow up on Moore's conditions to monitor whether she remained qualified for benefits under the policy. The policy's definition of disability would change to the "gainful occupation" definition on February 28, 2019—which was 24 months after the benefits begin date.

On October 24, 2017, NP Tubbs responded to Unum's request for information, recommending that Moore remain out of work for a full calendar year from that date—until October 24, 2018. He advised that Moore was "unable to stand for long periods of time or walk long distances due to pain, swelling, headaches, and dizziness." [14], Ex. 1 at p. 807. NP Tubbs stated that these restrictions were medically necessary to "give body time to recover." *Id.*

On October 26, 2017, Moore spoke with Unum for another update. Moore advised that she had an upcoming appointment with Dr. Spicer to determine whether her right foot would heal on its own or whether they would pursue surgery.[10] Moore explained that her left foot was healed but her balance was impaired. With respect to her cardiac, kidney, and blood sugar issues, Moore advised that they were not disabling.

---

[10] The Court found no other mentions of surgery in the administrative record and assumes surgery was ruled out as an option.

Moore saw Dr. Spicer again on November 8, 2017. Dr. Spicer found "no new Charcot changes" from the last x-ray performed on June 21, 2017. [14], Ex. 1 at p. 989. Moore reported pain in both feet, aggravated by pressure or walking, and alleviated by elevation. Moore also advised that the toenail on her right great toe had fallen off (Moore's medical records previously indicated her foot pain included painful toenails). Dr. Spicer wrapped Moore's right great toe and advised her to continue wearing the CROW boot and monitoring her feet.

Following this appointment, in a February 2018 response to Unum's request for information, Dr. Spicer recommended that Moore would be "off work for 99+ years." [14], Ex. 1 at p. 934. Dr. Spicer's response further stated that Moore must weight-bear while wearing the CROW boot and she cannot walk or stand for long periods of time.

Moore saw Dr. Stout, her cardiologist, twice more. At her December 13, 2017 appointment, Dr. Stout noted that Moore "denies lower extremity edema, but remains on two diuretics" and that Moore experienced shortness of breath with activity. [14], Ex. 1 at p. 883.[11] He adjusted her medication to discontinue one diuretic and resume a medication that had previously caused her to pass out from low blood pressure (with the direction to monitor her blood pressure). On January 26, 2018, Dr. Stout performed an echocardiogram (imaging of the heart) to reassess the function of Moore's left ventricle. The echocardiogram report states that cardiomyopathy and hypertension were indicated, but the left ventricle function appeared to be acceptable. *See* [14], Ex. 1 at p. 881.

The January 2018 appointment with Dr. Stout was the last time Moore saw a specialist. She did not return to a podiatrist, nephrologist, cardiologist, or other specialist after this

---

[11] Under "Assessment," Dr. Stout's listed conditions included congestive heart failure. [14], Ex. 1 at p. 884. Moore had previously mentioned in a phone call to Unum that congestive heart failure was suspected at one time but ruled out. Congestive heart failure is not mentioned in Moore's cardiology records when she had an echocardiogram one month after this appointment. Therefore, the Court assumes that Moore did not have congestive heart failure.

appointment, despite the referrals discussed below. Moreover, the frequency of Moore's medical treatment began to decrease significantly in 2018.

Moore saw Shana Smith, Family Nurse Practitioner, at Tutwiler Clinic on April 9, 2018; November 12, 2018; December 4, 2018; February 27, 2019, and July 2, 2019.[12] The medical records from 2018 indicate that Moore's feet had thick discolored skin, decreased strength, and edema. Moore was referred to a new podiatrist at her request, but no further podiatry records are found in the administrative record. By July 2019, Moore's lower extremity strength and edema had improved with medication.

Throughout 2018 and 2019, Moore continued to struggle with fluctuations in her blood pressure and blood sugar. Her blood pressure improved with medication in December 2018. However, NP Smith referred Moore to home health services for assistance with managing her diabetes. Moore was discharged from home health services in early 2019 because she was no longer home bound, though the record does not elaborate on the changes in Moore's condition. As Moore still struggled with blood sugar fluctuation, NP Smith referred Moore to an endocrinologist at her February and July 2019 appointments and advised Moore to call in her blood sugar readings weekly.

On November 5, 2019, Moore returned to Tutwiler Clinic, this time seeing Sabrina Easter, Family Nurse Practitioner. Moore reported to NP Easter that she had been admitted to Panola Medical Center one week earlier for blood sugar issues and numbness in her hands and feet; Moore received a prescription to manage the neuropathy. Like NP Smith, NP Easter advised Moore to call in her blood sugar readings weekly and see an endocrinologist. On this date, Moore reported having seen an endocrinologist after being referred by NP Smith. However, the Court does not

---

[12] Moore had transferred her primary care services to Tutwiler Clinic and was no longer seeing NP Tubbs.

find endocrinology records (or records from an emergency room visit around this time) in the administrative record.

Returning to the chronological order of events in the administrative record, on January 23, 2018, Moore spoke with Unum again and advised that her right leg was a different length due to her boot, which strained her left foot and impaired her balance while walking. Moore stated that she could not walk for any period without assistance, and she could not bend over due to her balance issues. She wore a special shoe on the left foot and stuffed it with tissue to maintain her balance. With respect to her daily activities, Moore advised that she was looking after her nine-month-old grandchild, which kept her busy all day. She also stated that she watches TV and does nothing else. *See* [14], Ex. 1 at p. 860.[13]

On February 21, 2018, Unum held another forum attended by Leslie Jeffers and Joe Vanier, with Debbie Haight and Angela Saucier-Tugman serving as the clinical and vocational representatives, respectively. At this forum, the "duration/claim direction" that was previously listed as "to at least 3 months" was changed to "poor prognosis for freq stand/walk." [14], Ex. 1 at p. 946-47. The attendees apparently concluded that Moore would not soon be able to stand and walk well enough to return to her job as a Tosser/Inspector. Unum's planned next steps were to retrieve more detailed information on Moore's education and work history for review with a vocational representative.

On March 27, 2018, Moore spoke to Unum regarding the information it sought. *See* [14], Ex. 1 at p. 987. Moore advised that she attended college in approximately 1994 or 1995 for one and a half years. She could not recall what classes she had taken because too much time had passed. Moore advised that prior to her work at Ajinomoto Windsor, Inc., she had worked in manufacturing

---

[13] Two years later, Moore stated that she did not supervise her grandchild alone, presumably due to her health issues.

involving automotive parts and caskets. From 1998 through 2000, Moore worked as a cashier at a gas station and as a housekeeper at a hotel. When asked about her computer skills, Moore explained that she had not used a computer since her health problems began (almost two years prior), though she did use her phone frequently. Moore estimated that when she was using a computer, she used it approximately once per month. During this conversation, Unum also explained to Moore that the policy's definition of disabled would eventually change from unable to perform her "regular occupation" to unable to perform "any gainful occupation" and that Unum would be performing a skills assessment to determine whether Moore had skills to perform alternative occupations.

On March 28, 2018, Angela Saucier-Tugman, Vocational Rehabilitation Tech, performed a skills assessment, which stated:

> Per the [work education and experience questionnaire] and IL TPC, the insured reported that her highest level of education was college classes taken in 1994/1995 with no degree obtained. The insured reports that prior to her current occupation (DOH 2010 per EE) she ran a machine that made automotive parts from 2000-2009. The insured also reported that she has not used a computer in two years and prior to that she maybe used a computer once a month.

> Given the Insured's work experience as a burrito maker and in manufacturing as well as no demonstrated computer skills; the Insured not would [sic] possess the skills necessary to perform at occupations that involve mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10Lbs occasionally.

[14], Ex. 1 at p. 992-93.

In other words, Unum's vocational analyst determined that Moore did not have the vocational skills necessary to perform sedentary occupations. On March 29, 2018, Unum sent Moore a letter advising that it had reviewed her LTD claim and that she continued to be eligible under the policy.

On June 19, 2019, Unum called Moore for another update as it continued to review her claim. Moore advised that she was still experiencing constant pain in her right foot, though her medication helped with the swelling. With respect to her daily activities, Moore explained that she "doesn't do really anything" and she still could not drive due to the boot on her right foot. [14], Ex. 2 at p. 139. She reported being able to perform household cleaning but had issues bending over due to her balance. Moore also stated that she could not return to work anytime soon because she "can't do a lot of standing and walking." *Id*. Moore stated she was standing "maybe 30-40 minutes" at a time, explaining that when she stood for too long, she had problems with her ankle and lower hip and swelling in her left foot. *Id*.[14]

Throughout 2018 and 2019, Unum had also been corresponding with Moore about her application for Social Security Disability Insurance ("SSDI") filed with the Social Security Administration ("SSA").[15] Moore originally applied for SSDI with the assistance of a vendor to whom Moore had been referred by Unum. The application Moore submitted with vendor assistance was denied in 2018.

Moore later retained attorneys Leanna and Thomas Reynolds to represent her in filing a new SSDI application. Her new application and application for reconsideration were denied on May 9, 2019 and June 13, 2019, respectively. Moore thereafter requested a hearing before an Administrative Law Judge ("ALJ"), which took place via telephone on May 20, 2020. Brenda E. Dumas, a vocational expert, was present at the hearing, and ALJ Laura Bach also considered the

---

[14] After this phone call, Unum's notes again state that, based on her vocational and medical information, Moore was unlikely to return to work and "[o]ngoing claim management is appropriate." [14], Ex. 2 at p. 141.

[15] The Court notes that there was considerable correspondence between the parties regarding the status of and documentation related to Moore's application, some of which is mentioned in the parties' briefs. However, the Court does find the majority of these details to be irrelevant to Moore's disability and will therefore not include the specifics of those exchanges in its analysis.

opinion of two consulting doctors, Dr. Madena Gibson and Dr. Glenn James, though it does not appear they were present at the hearing.

On June 3, 2020, the ALJ ultimately denied Moore's application, finding in pertinent part:

> **5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant is able to lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently. She is able to stand or walk two hours out of an eight-hour workday and she is able to sit six hours out of an eight-hour workday. She is able to climb stairs, ramps, ladders, ropes, or scaffolds occasionally. She is able to balance occasionally. She is able to stoop, kneel, crouch, and crawl frequently.**
>
> …
>
> At [sic] hearing, the claimant alleged disability on the basis of right foot deformity, neuropathy, and diabetes mellitus. She added that these conditions resulted in lower extremity pain, foot swelling, an inability to walk or stand for prolonged periods, and fluctuating blood glucose levels that interfered with her ability to perform work activities. She also identified her need to elevate her feet throughout the day as another condition that prevented her from working.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

[14], Ex. 2 at p. 305-06 (emphasis in original).

The ALJ's opinion goes on to survey Moore's medical records—similar to the way in which this Court has done above. The ALJ noted that the consulting doctors found Moore capable of performing work activities at the "light exertional level with additional postural limitations." [14], Ex. 2 at p. 307. As explained above, Moore's job as a Tosser/Inspector was categorized as

18

"light work," which requires frequent standing, occasional walking, and occasional exertion of up to 20 pounds, with "occasional" defined as a condition existing for 0-2.5 hours of an eight-hour work day. [14], Ex. 1 at p. 770, 914. Thus, the ALJ found the doctors' opinion "somewhat, but not entirely persuasive," stating, "The claimant's right foot edema, bilateral lower extremity discoloration, decreased right lower extremity strength, and decreased sensation throughout the bilateral lower extremities supports greater restriction in her ability to stand or walk. Prolonged standing or walking is likely to to [sic] increase her pain and swelling." *Id.*

In addition to medical evidence, the ALJ considered Moore's activities of daily living and noted the following:

> In her testimony, the claimant described limited daily activities. It is not that the undersigned concludes that the claimant's daily activities are unlimited. In fact, the claimant's residual functional capacity is consistent with difficulty performing activities. For example, activities that require prolonged standing or walking. Rather, the undersigned is not persuaded that the claimant's impairments limit her activities to a degree consistent with her allegations of disability.

*Id.*

As stated, the ALJ ultimately found Moore did not qualify for disability benefits because she had the capacity to perform sedentary work.

In July 2020, Unum began another review of the status of Moore's disability and eligibility for benefits under the policy. At this point, the policy's definition of disability had changed from "regular occupation" to "gainful occupation." On July 22, 2020, Unum sent Moore a "disability status update" form to be completed by Moore and her attending physician. In August 2020, Moore advised Unum that she had been having issues seeing providers due to the COVID-19 pandemic and no longer having Medicaid, though she had applied for new health insurance and was waiting on approval. Moore therefore sent Unum the form with only her portion filled out. Moore described

her daily activities as washing her face, brushing her teeth, checking blood pressure and blood sugar, taking medications, trying to prepare breakfast, trying to make her bed "and so on." [14], Ex. 2 at p. 339. Moore then stated, "I don't do much because my balance and mobility [are] not that good if I a [sic] long period of time." *Id.* Moore also advised that she wears her CROW boot and uses a cane.

On September 9, 2020, Unum initiated an intradepartmental transfer of Moore's claim in order to review Moore's functional capacity and ability to return to work. The internal notes state that Unum initiated the transfer because Moore "hasn't submitted medical from a provider in almost 3 years, she doesn't treat with providers she has in the past due to insurance changing, also could not remember new doctor's name. As her full [functional capacity] remains unclear, please transfer to [disability benefit specialist] for further capacity review." [14], Ex. 2 at p. 360.

The new disability benefit specialist then sent Moore's file to Carrie Cousins, Senior Vocational Rehabilitation Consultant, for a skills assessment "for alternate Sedentary options that would allow for use of assistive devices to aide with ambulation." [14] Ex. 2 at p. 367. As noted above, the first skills assessment (conducted over two years earlier on March 28, 2018) found Moore did not have the skills to perform sedentary jobs. Cousins reached a different conclusion, finding that the prior forum participants and the first skills assessment did not consider Moore's job description (which included the need to understand quality standards and train other workers) or the ALJ denial (which was received after the first skills assessment and also noted Moore's inspection work on the food production line). Cousins further found that the prior skills assessment did not consider Moore's work as a cashier or housekeeper, noting that "the material duties of cashiering have not changed . . . While cash registers may have changed these entry level unskilled options would offer on-the-job training just as would be offered to any new employee." [14], Ex.

2 at p. 368. Finally, Cousins emphasizes that Moore can use a computer and that the ALJ found Moore capable of unskilled sedentary work.

Therefore, Cousins, in a report dated September 21, 2020, concluded:

> Based on the insured's skills with cashiering, dealing with others, inspecting, training, and assembly she would have skills for alternate unskilled/semi-skilled entry level sedentary options which may require: mostly sitting, may involve standing or walking for brief period of time with the ability to make positional changes; lifting, carrying, pushing, pulling up to 10 pounds occasionally. Alternate options would allow for assistive devices such as the use of a cane to aide with ambulation.

*Id*.

Cousins then advised that Unum's next step should be to clarify Moore's restrictions and limitations and then refer the file for a vocational assessment.

Accordingly, Unum called Moore on September 24, 2020 for an update. When asked if she could perform a seated job, Moore responded that she had never had a seated job and would not know what she could do. Unum then asked if she could physically perform a seated job, and Moore responded that she did not know unless she tried. *See* [14], Ex. 2 at p. 373. Moore advised that her primary issues were standing, mobility, and balance. She had fallen "a couple times" when trying to bend over. *Id*. As to her current medical condition and treatment, Moore advised that she was still having daily pain and lack of sensation in her feet, and she was still in the process of getting health insurance.

Moore saw NP Easter again on November 30, 2020. Aside from an August 2020 emergency room visit for pain due to an ovarian cyst,[16] this was the first time Moore had seen a

---

[16] Upon admission, it was suspected that Moore may have had hyperglycemia (high blood sugar) or diabetic ketoacidosis, and it appears that Moore was given insulin for high blood sugar. However, the ER physician ultimately concluded that Moore's symptoms were attributable to an ovarian cyst. This ER visit was not mentioned in NP Easter's records.

provider in over a year. Moore last saw NP Easter at the November 5, 2019 appointment when she was still having issues managing her blood sugar. The medical record from the November 2020 appointment states that it was a "routine check up with med refills" and indicates no complaints or new diagnoses; it simply states that Moore was to continue with her current medications. [14], Ex. 2 at p. 489.

On December 8, 2020, NP Easter responded to Unum's request for information, stating that Moore would not be able to perform sedentary occupational demands on a full-time basis because "[Moore] has charcot's joint of right foot, wears a boot daily which makes walking difficult." [14], Ex. 2 at p. 512. NP Easter's response provided no additional information.

On December 10, 2020, Unum held another forum discussion where the group discussed Moore's medical records, NP Easter's recent response, and Cousins' skills assessment. The group concluded that "although uncontrolled diabetes is noted," it is "unclear if [Moore] is precluded from performing sedentary activity." [14], Ex. 2 a p. 558. Therefore, Moore's file was forwarded to Christina Young, Registered Nurse, for a clinical analysis.

In her clinical analysis, Young performed a detailed review of Moore's medical records and concluded "there is not evidence to substantiate that [Moore] is precluded from performing primarily seated activity with brief periods of standing and walking with the ability to make positional changes and use an assistive device, and lifting, carrying, pushing, pulling up to 10 pounds occasionally." [14], Ex. 2 at p. 563. Young provided a lengthy rationale in support of her conclusion. Young found that Moore's cellulitis, diabetic ulcer of left great toe, and wound from left great toe amputation had healed, and her Charcot's joint was managed by wearing a CROW boot. Young further states that while she has uncontrolled diabetes, Moore does not report symptoms associated with hypoglycemia or pain associated with her diabetic neuropathy. As to

22

Moore's hypertension, cardiomyopathy, chronic kidney disease, and other diagnoses, Young describes them as "grossly stable and asymptomatic at this time." *Id.* Finally, Young recommended a forum be held with an on-site physician for further discussion of Moore's claim.

A forum with on-site physician Maribelle R. Kim, D.O., Board Certified Internal Medicine, was subsequently held on December 22, 2020. Also in attendance were Eliza Burke, Disability Benefit Specialist; Katie Hadiaris, Burke's director; and Young. The consensus reached in that forum was that Moore's medical records did not show that she was precluded from performing sedentary occupational demands from November 30, 2020 (her last appointment with NP Easter) forward. Specifically, the forum participants noted that Moore had uncontrolled diabetes but no emergency room visits for hypoglycemic episodes or ketoacidosis, that Moore's diabetic neuropathy appeared stable and controlled by medication, and that the "more recent records do not indicate referrals to endocrinology, which would be expected if she were thought to have an impairing condition due to uncontrolled diabetes." [14], Ex. 2 at p. 567.  As to Moore's Charcot's joint, the forum participants found that Moore's condition appeared to be stable, that the exams do not indicate a fall risk, and that the use of a boot does not preclude sedentary work because it is mostly seated.

Following the forum, Dr. Kim was to memorialize her review with a written report. However, Dr. Kim first attempted to contact NP Easter to clarify Moore's restrictions and limitations. Upon calling NP Easter's office, Dr. Kim was directed to fax a letter with her specific questions, which she did. Dr. Kim received no response from NP Easter.

Dr. Kim's written report ultimately contained the same conclusions and rationale from the forum discussion above. Notably, under "Next Steps," Dr. Kim wrote "[Designated Medical Officer] Review is recommended because the issue is not one of adequate information but rather

of interpretation of the data in terms of functional capacity." [14], Ex. 2 at p. 578. In other words, Dr. Kim suggested Unum receive a second doctor's opinion on whether the medical evidence supported a lack of capacity to perform sedentary jobs.

Following the forum and Dr. Kim's report, Unum referred Moore's claim back to Cousins for a vocational assessment and to Designated Medical Officer Neal Greenstein, M.D., Board Certified Internal Medicine, for a second opinion on whether the medical evidence supported that Moore was precluded from performing sedentary work.

Following his assessment, Dr. Greenstein concurred with Dr. Kim:

> The [on-site physician] opines that the medical evidence does not support that the claimant was/is precluded from 11/30/20 forward from performing sustained full-time activities outlined above (concurrent with treatment).
>
> On 06/30/2020 the claimant was denied SSDI and it was noted that she had the residual functional capacity to perform sedentary work. The more recent records reflect Charcot right foot stability with use of a boot. There has been no indication of a fall risk, evidence for recurrent cellulitis, ulcers, or other complications. The claimant has not been experiencing since 11/2019 any hyper or hypoglycemic complications associated with her diabetes, no ER/urgent care visits, or management/evaluation by endocrine, and stability of her related neuropathy with gabapentin. In my opinion, if the claimants [sic] diabetic condition was impairing, some or all of these aforementioned would be occurring. . . At an 11/30/2020 follow up with NP Easter, there were no new complaints, reviews of systems were negative, and exam was unremarkable, except for a right foot boot. . .
>
> Therefore, in my opinion, the evidence does not support structural or functional deficits associated with the claimant's musculoskeletal, neurological, endocrine, or other organ systems documented by history, exam, diagnostics, or therapeutics that would preclude her from performing the sustained full-time sedentary activities referenced above from 11/30/20 forward. I concur with the [on-site physician] opinion.

[14], Ex. 2 at p. 587.

In her vocational assessment, Cousins analyzed Moore's work history, skills, education, and the restrictions and limitations supported by medical evidence to identify vocational options available to Moore in her labor market. The jobs identified were: cashier check cashing agency, cashier ticket selling, and order clerk food and beverage. *See* [14], Ex. 2 at p. 581. The hourly wages associated with these jobs ranged from $8.48 to $10.54.[17]

To summarize, like the ALJ, Young, Dr. Kim, and Dr. Greenstein concluded that, based on medical evidence, Moore was capable of performing full-time sedentary work. Cousins then identified sedentary-level jobs that qualified as gainful occupations under the policy. In accordance with these vocational and medical opinions, Unum determined that Moore no longer qualified for LTD benefits under the policy. Unum therefore advised Moore via telephone call and letter that it was discontinuing her LTD benefits on January 15, 2021. *See* [14], Ex. 2 at p. 599-605.[18]

IV. *Appeal*

On May 27, 2021, Attorney Reynolds sent Unum a letter advising that Moore was internally appealing its decision to deny her LTD benefits. The letter stated that Moore was appealing the decision because Moore "is unable to perform any work activities." [14], Ex. 2 at p. 622.[19] The letter additionally attached a "Physician Source Statement" completed by NP Easter in support of the appeal. The Physician Source Statement stated that Moore has a condition that is

---

[17] The wages associated with the identified jobs are significant because if the sedentary jobs satisfied the policy's definition of gainful occupation, then Moore's ability to perform the jobs would mean she no longer qualified as disabled under the policy. The policy defines "gainful occupation" as one "that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: . . . 60% of indexed monthly earnings, if you are not working." [14], Ex. 1 at p. 203. In February 2020, Unum calculated Moore's indexed monthly income to be $2,042.22, with 60% of that amount being $1,225.33 or $7.07 per hour. [14], Ex. 2 at 364. As the jobs identified by Cousins all have wages exceeding $7.07 per hour, they would be gainful occupations under the policy. Moore does not contest this particular issue.

[18] When Unum advised Moore of its decision via phone, it confirmed that Moore did not have a new podiatrist referral or appointment scheduled before informing her of its decision.

[19] When Unum advised Moore of its decision via phone, Moore objected to the decision because she wears a boot, has a toe missing, and has limited mobility.

expected to last 12 months or more, would need to elevate legs with prolonged sitting, would need to take unscheduled breaks during a normal workday, and would be off task for 25% of a normal workday and miss more than four workdays per month. Under diagnosis, NP Easter wrote: "Charcot's joint [right foot], amputated toe, uncontrolled [diabetes mellitus], [hypertension], anemia, hiatal hernia, hyperlipidemia." [14], Ex. 2 at p. 624. NP Easter further stated that Moore's symptoms were "gait disturbance." *Id*. As to specific restrictions and limitations, NP Easter stated that Moore could sit for less than 2 hours per day, stand/walk for less than 2 hours per day, rarely lift less than 10 pounds, never lift more than 10 pounds, and never twist, bend, couch, or climb ladders or stairs. Finally, NP Easter advised that Moore would have no significant limitations in doing repetitive reaching, handling, or fingering.

On June 21, 2021, Reynolds faxed Unum medical records from two appointments with NP Easter in support of Moore's appeal. One record was from Moore's November 30, 2020 appointment, which Unum had considered in its previous evaluation of Moore's claim. The second record was from April 16, 2021 and states "Patient is here today to talk to NP about disability paperwork." [14], Ex. 2 at p. 687. The record then lists Moore's diagnoses with no further update on her condition.

As in its original review process, Unum forwarded Moore's file and the additional medical records from NP Easter to John F. Coughlin, M.D., Ph.D., an on-site physician, for review. Dr. Coughlin found that NP Easter's restrictions and limitations were not supported by medical evidence. His review stated in pertinent part:

> The use of a CROW boot on the right foot does not by itself preclude the performance of required sedentary occupational demands. It is prudent to limit the amount of weightbearing. However, the amount of weightbearing required of the sedentary occupation under current consideration is minimal and likely no more than, or even less than, that required to perform [activities of daily living]. It is noted that

Ms. Moore uses a cane that would further offload weight on the right foot.

. . .

There were no physical findings and examinations of the feet to provide support for lack of capacity. The left great toe amputation is healed and there is no evidence of diabetic foot ulcers. There is documentation indicate [sic] peripheral diabetic sensory neuropathy in his [sic] feet that cause for the vigilance in examination of the feet and routine foot care but there is nothing in current documentation to indicate support for lack of capacity based on conditions related to the feet.

Regarding type 1 diabetes with stage 3 chronic kidney disease: Stage3 [sic] CKD would not be itself be expected to result in lack of capacity. Blood sugars, while elevated as indicated by the A1c, are not it [sic] ranges to support lack capacity [sic]. While it is noted that previously there was some fluctuation in blood sugars with appreciation of low blood sugars at times, there is no current documentation of significantly symptomatic episodes of hypoglycemia and/or hyperglycemia to support lack of capacity.

. . .

Physical exam findings do not support lack capacity [sic] based on the need to frequently elevate legs. There is no documentation of recent significant edema and there is no documentation of the use of compression stockings that would be expected in cases where there was significant lower extremity edema.

[14], Ex. 2 at p. 715.

Therefore, Unum determined its original decision to discontinue Moore's benefits was correct. Unum informed Moore of its determination by letter dated August 4, 2021. *See* [14], Ex. 2 at p. 721. Moore subsequently filed her Complaint [1] in this Court on December 31, 2021.

*Conclusions of Law*

The Court concludes that Moore has not proven by a preponderance of the evidence that she is "disabled" under the Unum LTD policy. The medical evidence indicates Moore is capable of performing the duties of a gainful occupation for which she is reasonably fitted by education,

training or experience. Specifically, the Court finds (1) that Moore has the capacity to perform the demands of a sedentary-level occupation; and (2) that there are sedentary-level occupations that satisfy the policy's definition of "gainful occupation."

A sedentary-level job is described in the Administrative Record as one that includes "mostly sitting, brief periods of standing or walking with ability to make positional changes; and lifting, carrying, pushing, pulling up to 10 pounds occasionally." [14], Ex. 2 at p. 721.

Moore's Complaint [1] states that she is disabled due to the following impairments: "Charcot's joint of the right foot, amputated toe, uncontrolled diabetes, hypertension, anemia, gait disturbance, kidney disease." The Court will address each condition in turn.

With respect to Moore's Charcot's joint and left great toe amputation, the ALJ and all reviewing doctors (two reviewing for the SSA, and three reviewing for Unum) concluded that these conditions do not prevent Moore from performing the demands of a sedentary-level occupation, particularly one that would allow the use of assistive devices such as her cane. By 2019, Moore's left toe amputation had healed, her Charcot's joint had stabilized, and she had regained normal strength in her feet. Her edema and neuropathy seemed to be managed by medication, and she had no recurring foot ulcers or cellulitis.

In addition to her medical records, Moore's activities of daily living reflect that she is able to walk and stand for brief periods. Moore reported to Unum that she performed household chores like making the bed and making her breakfast and that she stood for 30-40 minutes at a time. As Dr. Coughlin concluded, a sedentary-level job might in fact require less physical activity than Moore's activities of daily living. Therefore, the Court agrees with the ALJ and reviewing doctors who found that Moore's medical records and activities of daily living do not support a lack of capacity to perform sedentary work due to her Charcot's joint and amputation of toe.

With respect to Moore's anemia, hypertension, and kidney disease, the medical records, along with Moore's telephone calls to Unum, indicate that these are not disabling conditions. Moore saw her cardiologist four times and her nephrologist one time. She was prescribed medication and did not return to those doctors or receive further referrals. NP Smith's records indicate that Moore became compliant with her blood pressure medication and her hypertension improved. Moore reported to Unum on multiple occasions that her heart and kidney conditions were not disabling and were only being monitored. Therefore, the Court finds these conditions would not prevent Moore from performing sedentary work.

Finally, with respect to Moore's uncontrolled diabetes, the record reflects that Moore did struggle to manage her diabetes in 2018 and 2019. However, even when Moore was experiencing complications with her diabetes, at two appointments where she reported fluctuations in her blood sugar, and at one appointment where she had hyperpigmentation and edema in her feet, Moore nonetheless reported no acute complaints or symptoms. Then, when Moore returned to NP Easter in November 2020, after not seeing a primary care provider for one year, NP Easter did not refer Moore to endocrinology as she had in the past and no complaints or symptoms were documented in the medical records. This leads the Court to agree with the ALJ and reviewing doctors who found that Moore's diabetic symptoms did not support a lack of capacity to perform sedentary-level occupations.

Moreover, the Court emphasizes that Moore herself seems to believe she can perform a seated job. When asked if she could perform sedentary work, Moore's reservations moreso related to her vocational skills because she had never worked a sedentary job and she would not know what she could do. Thus, when asked if she could physically perform a sedentary job, Moore responded that she would not know unless she tried. And when informed that she no longer

qualified for LTD benefits, Moore stated that she could not work due to her balance and mobility issues, which, again, would not have a significant impact on her ability to perform seated work.

Having concluded that Moore has the ability to perform a sedentary occupation, the Court turns to whether these occupations qualify as "gainful occupations" under the policy. The policy defines "gainful occupation" as one "that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: . . . 60% of indexed monthly earnings, if you are not working." [14], Ex. 1 at p. 203. Unum determined that a "gainful occupation" for Moore would be one with wages exceeding $7.07 per hour. [14], Ex. 2 at p. 364. Cousins identified three sedentary-level jobs (a non-exclusive list) in Moore's labor market with wages exceeding $7.07 per hour.[20] Therefore, the Court finds Moore capable of performing a gainful occupation. This precludes her from eligibility for LTD benefits under the Unum policy. As noted above, Moore does not dispute that the identified jobs satisfy the policy's definition of "gainful occupations."

In further support of these conclusions, the Court feels compelled to address one of Moore's arguments in favor of a finding of disability.[21] Moore argues that Unum "cherry picked" medical evidence and did not properly consider NP Easter's Physician Source Statement. [16] at p. 9. Moore further states that Unum failed to consider the opinions of Moore's other doctors,

---

[20] The ALJ also identified jobs that exist "in significant numbers in the national economy" for which Moore would be qualified. [14], Ex. 2 at p. 309.

[21] Moore also argues that Unum arbitrarily dismissed its own occupational testimony when it referred Moore's file to Cousins for a second skills assessment and Cousins reached a different conclusion than the first vocational analyst. Moore's argument relies heavily on Unum's prior claim practices, and Unum spends considerable time in its brief addressing this argument. As the applicable standard of review in this case is *de novo*—not the abuse of discretion standard—the Court will not address arguments regarding alleged arbitrariness or conflicts of interest because they are irrelevant here. The Court only notes that Moore's burden of proof does not change because she initially qualified for benefits and the benefits were later terminated when she no longer qualified. *Pike*, 368 F. Supp. 3d at 1072.

pointing to a February 2018 statement from Dr. Spicer that Moore would be out of work for 99+ years.

Regarding this contention, the Court notes that it has carefully considered all evidence contained in the administrative record. As to Dr. Spicer's February 2018 statement, the Court emphasizes that this statement was written on a form asking whether Moore could return to "light work," which requires frequent standing and occasional walking. *See* [14], Ex. 1 at p. 933-34. Therefore, Dr. Spicer and Unum reached the same conclusion—Moore would not return to work at the "light" exertional level. Nonetheless, to Moore's assertion that Unum did not consider the opinion of Moore's other providers, NP Smith and NP Easter were the only providers Moore saw after January 2018, which was three years before Unum determined Moore no longer qualified for benefits. As to NP Easter's conclusions, NP Easter saw Moore on only two occasions (and on one occasion to complete paperwork) and provided no reasoning for her recommended restrictions and limitations. When Unum's request for information provided the definition of a sedentary job (mostly sitting, brief periods of standing or walking) and asked whether Moore would be able to perform such a job on a full-time basis, NP Easter responded that Moore could not perform a sedentary job because Moore "has Charcot's joint of right foot, wears a boot daily which makes walking difficult." [14], Ex. 2 at p. 512. In other words, NP Easter concluded that Moore could not perform a *seated* job due to a condition that affects Moore's walking and provided no further medical explanation for that conclusion. Similarly, on the Physician Source Statement, NP Easter checked that Moore was able to sit for less than two hours, though Moore's medical records and NP Easter's prior response indicate that Moore in fact needs to be seated most of the time. Again, NP Easter provided no explanation for her recommendations in the Physician Source Statement. While the Court appreciates that NP Easter, not the reviewing doctors, actually treated Moore, the

scant amount of information provided by NP Easter (which is almost entirely what Moore relies on) does not provide sufficient information for Moore to prove she is disabled by a preponderance of the evidence, especially when measured against the opinions of an ALJ and five reviewing doctors. *See, e.g.*, *Pike*, 368 F. Supp. 3d at 1030 (noting that the claimant bears the burden to establish that she is entitled to benefits).

*Attorney's Fees*

Under 28 U.S.C. § 1132(g)(1), the Court has discretion to award reasonable attorney's fees, including to the non-prevailing party. *Young v. Wal-Mart Stores, Inc.*, 293 F. App'x 356, 363 (5th Cir. 2008). In an ERISA case, the Court applies the following five factors to determine whether the party is entitled to attorney's fees: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions." *Id.* (citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980)).

Moore contends that the first three factors and the fifth factor support awarding her attorney's fees but offers no explanation for this contention.

As to the first factor, the Court finds Unum did not act in bad faith nor is it culpable of wrongdoing. Rather, as explained at length above, Unum engaged in extensive reviews of Moore's medical records and communicated with her at essentially every step along the way. As to the second factor—the respective abilities of the parties to satisfy an attorney's fee award—Unum admits that the factor weighs in Moore's favor. As to the third factor, the Court finds that there is

32

no conduct to deter in this case. As to the fourth factor, Moore does not seek to benefit all plan participants or resolve a significant legal question regarding ERISA. Finally, as to the fifth factor, Moore's claim fails on the merits. In summary, only one factor weighs in favor of awarding attorney's fees. The Court, utilizing its discretion, therefore finds that attorney's fees are not justified in this case *See Wal-Mart*, 293 F. App'x at 364. Therefore, Moore's request for attorney's fees is denied.

## Conclusion

For the reasons set forth above, Moore's Motion for Summary Judgment [15] is DENIED. Unum's Motion for Judgment on the Administrative Record or, alternatively, Motion for Summary Judgment [17]is GRANTED. Moore's claims against Unum are dismissed *with prejudice*. A Final Judgment consistent with this Order and Memorandum Opinion will issue this day. This CASE is CLOSED.

SO ORDERED, this the 21st day of March, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE